CENTRAL REALTY COMPANY *v.* BOARD OF REVIEW

(No. 6948)

Submitted April 21, 1931. Decided May 5, 1931.

*Livezey, Hogsett & McNeer,* for plaintiff in error.
*John T. Simms,* for defendant in error.

WOODS, JUDGE:

The Central Realty Company, a corporation, by this appeal, attacks certain assessments made against the Frederick Hotel property for the year 1930. The building was assessed at $175,000, and the lot, on which the same is located, at $500,000. Evidence was produced by the corporation before the board of review, and the board itself called in other witnesses. A reduction was denied. The record made before the board was then considered by the circuit court of Cabell county and that court denied relief, finding that "said values are not more than the true and actual value of said grounds and improvements."

It is insisted that both the board and circuit court ignored the statutory basis for fixing the value of the property, and that the property should not have been assessed at more than $500,000, i. e., building $100,000, real estate $400,000.

The evidence as to the value of the land is definite although the amounts are conflicting. One witness places its value as high as $540,000. The circuit court found the original assessed value of $500,000 to be proper, and in view of our holding in *Liberty Coal Co.* v. *Bassett, Chairman*, 108 W. Va. 293, such finding will not be disturbed. This brings us to a consideration of the valuation of the building.

In addition to the portion of the building used by the hotel, storerooms were leased out to nine or ten different concerns. Of the several witnesses introduced before the board on behalf of the complainant, C. L. Ritter, C. W. Watts, A. Z. Litz and Dr. R. Stern were stockholders therein. The last three stated that the building was worth not more than $100,000. Harvey C. Taylor and Fred M. Bailey, both interested in real estate, testified that $150,000 would cover it. E. F. Adams, the bookkeeper, testified that the net income for 1926 was $14,197.43; for 1927, $16,001.48; for 1928, $12,885.05; and for 1929, $19,537.28. In arriving at the total valuation of building and real estate, the several witnesses heretofore mentioned, who testified as to value, seem to have been influenced somewhat by the net income derived from the property, and market value of the stock of the company (2552 shares). Taylor, however, said, to get at the building's true and actual value, it would have to be measured and cubed, etc. He stated that net income was one element that must be taken into consideration, as well as location, rental value, management, and a good many other things. He took an option on property for $625,000, thinking he had a buyer in view. Dr. Stern had an option in a like amount, but admits he did not try to secure a purchaser in view of market conditions. The stock, at $100 par value, had been held for sometime at $200 without any demand. Litz bought a few shares at $190 from a party in Logan, who had recently inherited the same from an aunt. The assessor, Eugene Salmon, stated that he entered the property on the tax books at the value set by the circuit court for 1929; that it was a proper assessment, when considered in relation to other properties of a like nature, etc., and was in line with the standard of valuations maintained throughout the county.

No testimony was offered tending to show the gross income of the property for any one year or period of years. A few days later, after an apparent submission of the case, the board of equalization and review called in Carl Varnum, H. O. Dunfee and Hiram Pilcher, members of the Huntington Real Estate Board. These three individuals valued the building at from $419,904 to $489,888, upon a reproduction cost, less depreciation, since 1906, the date of the building's construction. While exception is taken to this procedure, it appears that the realty company had notice and was present by counsel and cross-examined the witnesses. Since the board is not charged with any specific manner of taking evidence, we do not think this action on its part was necessarily erroneous.

In reviewing an assessment, the presumption is in favor of its correctness, and hence the burden of attack falls on the party complaining. 3 Cooley on Taxation (4th Ed.), p. 2442.

Appellant in support of its position states that the board of equalization and review was influenced by reproduction cost of the building, less depreciation, as indicated in a letter from said board, and that such element was improper under the statute (section 12, chapter 29, Code 1923), which provides that property, both real and personal shall be assessed "at its true and actual value (that is to say, at the price for which such property would sell if voluntarily offered for sale by the owner thereof, upon such terms as such property, the value of which is sought to be ascertained, is usually sold, and not the price which might be realized if such property were sold at a forced sale)."

In discussing the valuation of corporate property for taxation, the author in 2 Cooley on Taxation (4th Ed.), p. 1682, after indicating that taxable value and true value are synonymous, makes the following observations: "The cost is not necessarily the taxable value, nor is the cost of construction less discount for depreciation, nor is the cost of reproduction with an allowance for deterioration, but such items may be taken into consideration as well as the earnings or dividends of the company. So the market value of the shares of stock

and bonds is not conclusive evidence of the value of the property of a corporation, although often a useful and important element in valuation. Net earnings may be considered in determining the value, but the value cannot be determined by that circumstance alone.''

It is common knowledge that value of a building such as we have here is affected by a multitude of circumstances which no rule could foresee or provide for. The assessor must consider all these circumstances and elements of value, and must exercise a prudent discretion in reaching conclusions. The same elements which prompt his action in various ways, during normal conditions, either directly or indirectly, influence the consideration that a willing seller can obtain from a willing buyer.

So long as business conditions are normal, it is possible to arrive at the statutory value. But does the law require the rule to be strictly applied to any particular year in which property, due to depression and unhealthy business conditions, has no prospective buyer at any figure? The assessment set by the circuit court for 1929 at $175,000 was not appealed from. It was accepted by appellants. Why a 42 6/7 reduction for 1930? The net earnings for the year 1929 were greater than those of 1928 by several thousand dollars. Was it the purpose of the statute to jeopardize the machinery of state, county, district and municipality, during a depression, or was it enacted to cover ordinary conditions existing over a period of years? To ask the question is to answer it. Values of real estate and fixtures thereon are more or less constant over a period of years. What it was valued at last year may have a bearing on this year's assessment.

While the appeal to the circuit court ''shall be determined from the evidence so certified'' (Code, chapter 29, section 129) and not by evidence *de novo* as to value *(State, etc.* v. *Woods,* 90 W. Va. 288), the circuit court must of necessity view the evidence so certified in the light of the general business conditions existing at the time. The statute last cited further provides: '' * * * If, upon the hearing of such appeal, it is determined that any property has been assessed

for more than its true and actual value, the court shall, by an order entered of record, correct every such assessment, fixing such property at its true and actual value.'' The fact that property cannot be sold at a particular period of depression should not be taken as conclusive that its value has been materially reduced. While the assessment is to be made as of a certain date, the value of the property is established over a period of years. Witness Litz states that the net incomes in 1923, 1924 and 1925 were 36, 38 and 40 thousand, respectively. While the income producing capacity of property is an important factor in determining its value, it is ordinarily not the sole thing for consideration. 3 Cooley on Taxation (4th Ed.), p. 2308. And further, if the valuation is based principally on earnings, the average earnings and expenses for a series of years, or for such time as is reasonably available, must be considered. Idem, p. 2311-2312. Pilcher stated that, in arriving at his valuation of $419,900 (which was on a cubical cost basis less depreciation), he took into consideration every other factor which should enter in the proper appraisement of property of that nature—business conditions, kind of building, etc. This witness stated: ''Of course, we have conditions now that we are in, it is pretty hard to find buyers for anything.''

In view of the evidence submitted, we cannot say that the circuit court erred in approving the assessment for 1930. He was entitled to consider the general conditions in the city of Huntington, as well as the general depression, just as much as the assessor and the board of equalization and review.

The judgment of the circuit court is affirmed.

*Affirmed.*